Siobhan Klassen
GODDARD LAW PLLC
39 Broadway, Suite 1540
New York, NY 10006
Tel: (646) 964-1178
Fax: (212) 208-2914
siobhan@goddardlawnyc.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| JONATHAN ZORIO,<br><br>               Plaintiff,<br><br>   vs.<br><br>NEAR NORTH AMERICA, INC.,,<br><br>NEAR INTELLIGENCE HOLDINGS, INC.and<br><br>NEAR INTELLIGENCE, INC.,<br><br>               Defendants. | Case No.: 2:23-cv-08206-RAO<br><br>**AMENDED COMPLAINT**<br><br>**Jury Trial Demanded** |

PLAINTIFF JONATHAN ZORIO, by and through his attorneys Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, NY 10006, alleges upon knowledge with respect to his experiences, and upon information and belief as to all other matters, as follows:

**PRELIMINARY STATEMENT**

1.      PLAINTIFF JONATHAN ZORIO ("Plaintiff") was an employee of Defendants Near North America, Inc. and/or related entity Near Intelligence Holdings, Inc., now known as Near Intelligence, Inc., (collectively, "Near" or "Defendants Near") from August 1, 2022, to December 7, 2022, when his employment was terminated because of his race and national origin. More specifically,

his employment was terminated because he is white and American. The decision-makers on the Executive Leadership Team ("ELT") are all Asian – from India or China (the "Near Decision-Makers").

2.      Plaintiff was also terminated because he regularly apprised the Near Decision-Makers of misstatements of fact and other irregularities in financial and customer reports, ongoing misrepresentations to prospective customers, customers, regulators, legislators, securities analysts, and the general public concerning Near's supposed commitment to data privacy and compliance with the European Union General Data Protection Regulation ("GDPR"), California Consumer Privacy Act ("CCPA"), and other privacy standards, such as Near's longstanding practice of misusing ad tracking and real-time bidding data from digital/online ad exchanges, and the ongoing sale of sensitive location data to third parties.

3.      Plaintiff was terminated in retaliation for questioning Near's absurdly ambitious revenue goals for 2023 and beyond, and blatant misrepresentations to prospective customers, and customers that Near had been certified as Service Organization Control 2 ("SOC2") compliant and International Organization for Standardization 27001 ("ISO 27001") certified, and that Near employed the requisite internal controls those certifications embody.

4.      Plaintiff was terminated in retaliation for regularly voicing his concerns to the ELT about Near's accounting practices, and the legality of Near's business relationships with key partners such as MobileFuse, and multiple customers acting as shell companies for government entities such as the US Department of Defense and the US Intelligence community. Together with global customers whom Near actively misled about its violation of data compliance regulations, these entities comprised over half of the company's annual revenue. Plaintiff was terminated in retaliation for voicing his concerns about Near's misrepresentations to its lenders concerning its financial health, irregularities, documented complaints, and discrimination in the company's human resources function; irregularities in the accounting and tax treatment of the company's restricted stock units

("RSUs") for executives and employees; unreported material taxable benefits to Decision Makers paid for by Near; the longstanding practice of reimbursement of hundreds of thousands of dollars in executive travel expenses without proper records and receipts. Overall, Plaintiff was terminated in retaliation for consistently voicing his concerns about Near's lack of readiness to become a publicly-traded company given Near's troubling business practices.

5.     For their part, the Near Decision-Makers were focused entirely on going public via merger with KludeIn I Acquisition Corp. ("KludeIn"), a special purpose acquisition company ("SPAC"), rushing headlong toward a goal by which each of the Near Decision-Makers stood to gain tens of millions of dollars, with willful disregard for Defendants Near's general compliance with SEC laws and regulations, the most basic internal governance, financial and operational controls, the reliability of its forward-looking statements to the financial markets and the public, or its ability to deliver properly sourced, anonymized, and consented data to its clients and business partners.

6.     To meet their goal of bringing the company public as quickly as possible, and to lend the veneer of truthfulness and reliability to Near for the SEC and potential investors, Near recruited highly qualified, white, Americans – primarily men in their 40s – to key executive and C-Suite level positions. When the highly qualified Americans started raising concerns about Near's day to day operation, absurdly ambitious revenue and growth projections, key operating metrics that could not be explained, replicated, or calculated, highly unusual or non-existent internal governance; lack of open and transparent customer and vendor relationships, finance and accounting systems, controls, and reporting; and other questionable practices at the company, Defendants Near terminated their employment. Along the way, Defendants Near secretly removed responsibilities from, and undermined, the American business leaders, leaving them as window dressing while the Near Decision-Makers led shadow operations from Defendants Near's Bangalore, India offices. In parallel, the Near Decision-Makers created and propagated false narratives about the American business

leaders, questioning their competence, ethics, "team spirit," "cultural fit," "mental state," or their willingness to "go along." Thus, Near pretextually justified the termination of their employment.

## PARTIES

7.      Plaintiff resides in Chicago, Illinois. While an employee of Defendants Near, Plaintiff worked remotely from his home and from Near's Pasadena, California office. Administratively, Plaintiff was assigned to Near's Pasadena, California office.

8.      Defendant Near North America, Inc. is incorporated under the laws of the state of Delaware.

9.      Defendant Near Intelligence Holdings, Inc. is incorporated under the laws of the state of Delaware.

10.     Defendant Near Intelligence, Inc. is incorporated under the laws of the state of Delaware.

11.     Defendants Near's headquarters in the United States are located in Pasadena, California. The Near Decision-Makers work from Near's Pasadena offices and global headquarters in Bangalore, India, and Singapore.

## JURISDICTION AND VENUE

12.     The United States District Court has jurisdiction over this complaint pursuant to 28 U.S.C. § 1331, as Plaintiff's claims include issues of federal law. This Court can exercise supplemental jurisdiction over the claims that do not assert issues of federal law, pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in the United States District Court for the Central District of California, Los Angeles Division pursuant to 28 U.S.C. § 1391, because Defendants Near are domiciled in the Central District of California, Los Angeles Division.

COMPLAINT

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

14.     Plaintiff dual filed his charge of discrimination with the U.S. Equal Employment Opportunities Commission and the Civil Rights Department of the State of California on January 20, 2023.

15.     On July 3, 2023, Plaintiff received a Notice to Complainant of Right to Sue from the Civil Rights Department of the State of California.

16.     On August 1, 2023, Plaintiff received a Dismissal and Notice of Rights from the U.S. Equal Employment Opportunities Commission.

17.     This action was timely commenced fewer than 90 days after the U.S. Equal Employment Opportunities Commission issued its Dismissal and Notice of Rights, and less than one year after the Civil Rights Department of the State of California issued its Notice to Complainant of Right to Sue.

## FACTS

### Plaintiff Is Eminently Qualified
### For Role As Chief Revenue Officer At Near

18.     Plaintiff has more than 25 years' experience in the tech industry, working for private and public companies at all stages of growth and maturity. He has repeatedly built highly successful, high growth go-to-market, sales, and customer success teams, driving 7-, 8-, and 9-figure client sales and has driven double- and triple-digit revenue increases at the companies where he worked. He has brought companies public, raised venture capital equity and debt, sold companies, and filled numerous operational, financial, and sales leadership roles in scaled global enterprises.

19.     He was, in short, exceptionally well-qualified to serve as Chief Revenue Officer ("CRO") and lead the transformation of Near's global marketing, sales, customer success, and revenue generation function to meet aggressive sales and revenue goals for 2023 and the coming years.

COMPLAINT

20. He is also a white, American, heterosexual male in his 40s, with a reputation for delivering results that impress investors, colleagues, and teammates of all ethnicities, genders, sexual orientations, and age demographics.

21. Before working for Defendants Near, Plaintiff was the Senior Vice President of Sales & Customer Success for Global Strategic Accounts with Neustar, Inc., a company that sold anonymized, protected, and compliant customer identity, and personally identifiable information ("PII") solutions to large enterprises all over the world. Plaintiff was personally involved in GDPR, SOC2, information security, and other compliance work while at Neustar, Inc. and in prior leadership roles, from an operational standpoint and in working with large, complex customers.

22. As Near's CRO, Plaintiff was a corporate officer and a member of the ELT.

23. As CRO, Plaintiff had primary responsibility for growing Defendants Near's global business and making it profitable over the course of three years and preparing the company for its initial public offering ("IPO") in the next 18 months, as committed during his interviews. High growth tech companies typically operate at a loss for several years before becoming profitable, and Defendants Near was not yet profitable when Plaintiff joined. It was Plaintiff's job to ensure that Near had the necessary go-to-market, sales, and customer success processes, talent and resources, marketing investment to build client awareness, deal/opportunity pipeline, reporting infrastructure, and contracts in place to meet Near's projected 50%+ revenue increase in 2023 over 2022, and improve negative earnings before interest, taxes, depreciation, and amortization ("EBITDA") from approximately -$23 million in 2022 to -$8 million in 2023.

24. These projections were set in 2021, long before Plaintiff started working for Defendants Near. The projections were not based on rigorous bottom-up planning and they were not adjusted or revisited as 2022 unfolded. Indeed, Plaintiff lobbied for many months to have the numbers reduced to something more reasonable, given that he saw the severe immaturity of the organization and the early stages of an economic slowdown relative to the unrealistic targets Near set the prior

year. In mid-November, Plaintiff succeeded in getting the Near Decision-Makers to reduce 2023 projected revenue growth from 50%+ to 35% over 2022. This change was not reflected in filings with the Securities Exchange Commission ("SEC") until January 17, 2023. Notwithstanding that, the 35% revenue growth projection for 2023 remained a highly aggressive goal, given the extreme immaturity of Defendants Near's sales, marketing, and customer success organization, the severely lacking productive direct sales and partner capacity, the sharp decline in the quality and salability of Near's data over the course of 2022 and the overall lack of resources required to meet the projection.

25.    Plaintiff was ultimately responsible for all new marketing, business development, sales activities, customer and business partner relationships, and ensuring that Near could and did fulfill its new and existing customer contracts, while retaining its customers.

### The Near Decision-Makers and ELT

26.    The Near Decision-Makers are a subset of the ELT. They run Defendants Near in a highly secretive, dictatorial, command and control fashion, brooking no inquiry or dissent from the remaining members of the ELT or employees. The rest of the ELT either know not to question the Near Decision-Makers or they are forced out. Consequently, the ELT is comprised of Near Decision-Makers, "yes-men" -- willing participants who have been promised financial gain for their acquiescence, and a revolving door of dissenters who have been fired, resigned, or otherwise forced out of the company.

27.    The Near Decision-Makers are:

- Anil Matthews – Chief Executive Officer ("CEO Mathews"), who is ethnically Indian and resides in the United States and India;

- Shobit Shukla – President ("President Shukla"), who is ethnically Indian and resides in Singapore and India;

- Rahul Agarwal – Chief Financial Officer ("CFO Agarwal"), who is ethnically Indian and resides in India; and

- Madhu Therani – Chief Technology Officer ("CTO Therani"), who is ethnically Indian and resides in India.

28.    The "yes-men" consist of:

- Gladys Kong – Chief Operating Officer ("COO Kong"), who was born in China, is ethnically Chinese, and resides in the United States;

- Justin Joseph – Chief People Officer ("CPO Joseph"), who is ethnically Indian and resides in India;

- Vijay Kuppili – International Sales Leader ("Sales Leader Kuppili"), who is ethnically Indian and resides in India;

- Hari Palappetty – Vice President of Engineering ("VP Palappetty"), who is ethnically Indian and resides in India; and

- Michelle Zhou – Head of Product ("HP Zhou"), who was born in China, is ethnically Chinese, and resides in the United States.

- Jay Angelo – General Counsel ("GC Angelo"), who a white, American, and resides in the United States;

29.    Finally, the dissenters consisted of:

- Plaintiff;

- Ray Williams – Senior Vice President of Engineering ("SVP Williams"), who is white, American, and resides in the United States; and

- Jay Angelo – General Counsel ("GC Angelo"), who a white, American, and resides in the United States.

30.    Of the three dissenters, only GC Angelo remains with Defendants Near. SVP Williams resigned in disgust and his final day as a full-time employee was April 30, 2023. SVP Williams served in a severely diminished capacity as a senior leader in his final months with Near, as Near reassigned his global engineering team after his direct report, an ethnic Indian based in Bangalore, complained to CEO Matthews that he "did not want to report to an American."

31.    GC Angelo, as a newly hired, white, American senior executive had been an equal and vociferous dissenter with Plaintiff until November 30, 2022. As experienced leaders, GC Angelo, SVP Williams, and Plaintiff quickly came to observe the fraudulent and questionable business practices at Near, including deep suspicion about the legitimacy of the MobileFuse partnership, and sought to push back on the ELT and Near Decision-Makers. GC Angelo expressed his unambiguous

COMPLAINT

and candid views in numerous conversations and hundreds text messages exchanged with the Plaintiff beginning in their early days with Near and continuing through Plaintiff's last day at Near.

32.     GC Angelo started November 30, 2022 as a dissenter, engaging in continued, text and oral communications with Plaintiff concerning Defendants Near's deeply concerning business practices. After a meeting with CEO Mathews, during which GC Angelo expected to be fired, GC Angelo had a sudden change of heart and became a "yes-man." Numerous text messages among GC Angelo, SVP Williams, other senior advisors, and Plaintiff, however, profess to GC Angelo's, SVP Williams, and Plaintiff's ongoing concerns about Defendants Near's irregular business practices, lack of financial controls, GDPR and CCPA violations on a global scale, lack of corporate governance, unwillingness to disclose critical information about Near's operation, misstatements of fact to prospective customers, customers, government entities, and the SEC.

33.     Plaintiff, SVP Williams, and GC Angelo shared their concerns and skepticism about Near's ability to become a publicly-traded company by following the law and SEC regulations, given the priorities of the Near Decision-Makers, ELT, SPAC investors, and Board members simply to enrich themselves. In numerous text messages and conversations, Plaintiff, GC Angelo, and SVP Williams shared their misgivings of Near Decision-Makers, and routinely questioned their competence and unethical behavior. The views of GC Angelo, SVP Williams, and Plaintiff were also captured in interviews by third party consultants hired to assess the capability and readiness of CEO Mathews.

**Almost Immediately, Plaintiff Notices that Near's Operations
are Chaotic and Inconsistent With A Company On the Cusp of Going Public**

34.     Defendants Near projected a 50%+ increase in its revenue in 2023, for a total of $91 million. Defendants Near eventually lowered the revenue projection to $81 million in late-November, which remains an aggressive 35% increase over 2022. As CRO, Plaintiff had the five months between August and December 2022 to build out a sales function that was capable of delivering this growth.

This necessarily entailed analyzing the efficacy of the existing staff and hiring additional staff members, as well as implementing a means of evaluating the quality of existing deals, the customer management systems, the existing pipeline of deals, targeting sales efforts to potential customers with the greatest potential revenue, and measuring the health and revenue expansion opportunities with existing customers. These metrics comprise a basic sales and customer success infrastructure, which the Plaintiff had successfully built and executed globally numerous times prior to joining Near, yet Defendants Near did not have any of these elements in place. The sales and revenue function was embryonic, dysfunctional, and highly disorganized for a company of Near's size, with the intention of going public in the coming months.

35.    Upon joining the company, Plaintiff repeatedly requested to see the information, calculations, and assumptions underlying the $91 million 2023 revenue projection. If nothing else, it would give him a starting point from which to build out the sales function. Near Decision-Makers stonewalled him and either would not or could not share with Plaintiff any information underlying the $91 million sales 2023 revenue projection.

36.    In his first few weeks at the company, Plaintiff noticed that all accounting systems resided in Bangalore, India, and were tightly controlled by a small, inexperienced team reporting to CFO Agarwal. Very little meaningful, vetted financial information was ever made available to anyone on the ELT. When it was shared with the ELT, the data was "cherry picked" and spoon-fed to Controller John Faieta ("Controller Faieta"), who would only share small snippets of information, and who was unable to conduct any logical or in-depth explanations of the information. This lack of transparency, combined with CFO Agarwal's and Controller Faieta's inability or unwillingness to explain core parts of the business and its financial footing, was highly unusual for any company seeking to go public in the U.S.

37.    Plaintiff sought explanations of critical finance/accounting numbers, and information concerning key partners like MobileFuse, CEO Mathews and other Decision Makers invariably

COMPLAINT

responded that Plaintiff should "focus on what matters," or that Controller Faieta did not have access to the information and, therefore, could not explain how the company functioned. On numerous occasions, Controller Faieta told Plaintiff, "I don't have any of those details."

38.    Plaintiff also noticed the curious practice of the Near Decision-Makers to employ unknown U.S.-based or Bangalore vendors to perform critical accounting and compliance services. For example, the company's well-known auditors were replaced with a firm no one had ever heard of, and none of the Decision Makers, COO Kong, or Controller Faieta would explain, the reason for the change. Instead of a well-known SOC2 compliance vendor with whom SVP Williams and Plaintiff worked with for many years, CEO Mathews tasked Chief People Officer Justin Joseph ("CPO Joseph") to find an alternate vendor. CPO Joseph was not qualified to assess and select such a vendor. The Near Decision-Makers decided to not use a customary underwriter or investment bank for the company's IPO process. This is highly irregular, given the necessary transparency and controls required around core company operations.

39.    As it is easier to retain and grow existing customers and business partners than to cultivate new ones, and as an essential element of the CRO role, it was important for Plaintiff to be familiar with Defendants Near's most important customers and business partners. The Near Decision-Makers stonewalled him in this effort, too. For example, when Defendants Near had meetings and calls with MobileFuse, a business partner responsible for 30% of Defendants Near's revenue, the Near Decision-Makers barred Plaintiff from attending these meetings and calls and forbade him from having contact with anyone on the MobileFuse team. They also became defensive with him, refusing to share with him any details about the relationship history, scope of work, contract details, accounting, and usage tracking surrounding the business relationship between Defendants Near and MobileFuse. Instead, CEO Mathews told Plaintiff to "focus on what matters." and became highly agitated when Plaintiff pushed back. In addition, Plaintiff was frequently dissuaded from asking about

MobileFuse by COO Kong, who said, "Only [CEO Mathews, President Shukla, and CFO Agarwal] meet with MobileFuse."

40.     In addition to being barred from meeting a strategic partner, Plaintiff had other reasons to be suspicious about the nature of Defendants Near's relationship with MobileFuse. Under the contract with Defendants Near, MobileFuse pays Defendants Near $18 million each year for the right to resell advertising services on an obsolete platform, Allspark, to its customers. Upon information and belief, MobileFuse's total annual revenue is approximately $60 million. It is irrational for a company to sell an obsolete platform to its customers when more modern, better performing alternatives exist, and it is irrational for a company to invest up to 30% of its revenue for the right to resell an obsolete platform.

41.     Plaintiff never met or had contact with anyone at MobileFuse, despite repeated requests, so he cannot reconcile these seemingly inconsistent and irrational facts. The size of the Mobile Fuse relationship and the purported $18 million it pays to Defendants Near for an obsolete platform raised immediate and deep concern with Plaintiff, as this was not a dependable revenue stream upon which to rely to deliver 2023 revenue and beyond. This revenue would need to be replaced by adding significant Defendants Near sales capacity, which would require hiring, or making another acquisition. Moreover, Plaintiff searched extensively for customer, accounting, and/or usage data to help explain the MobileFuse relationship, but only ever found evidence of approximately $2 million in revenue, annually. This is far short of the $18 million in revenue the Decision Makers claimed the MobileFuse relationship generated. Near Decision-Makers did not share Plaintiff's concern and did not discuss the long-term plan for MobileFuse with Plaintiff, despite his repeated requests. Suspiciously, the Near Decision Makers claimed they could turn the revenue flowing from MobileFuse up or down whenever they wished. They never explained how they could do so.

42.     Plaintiff repeatedly informed the Near Decision-Makers that Defendants Near must disclose material business relationships to the SEC -- relationships comprising more than 10% of

annual revenue. This included its relationship with MobileFuse. They refused to do so until its filing on January 17, 2023.

43.     Without a functional sales infrastructure, Plaintiff set upon learning the existing Defendants Near sales, marketing, and customer function from the ground up. He toured each of the sales offices around the world, met with his functional teams, learned their capabilities, met with key customers and partners, and analyzed in great detail what it would take to meet the 2023 sales projection. From these meetings and his experience building highly effective global sales and marketing teams, Plaintiff concluded that Defendants Near would need to recruit and hire approximately 85 additional employees in various marketing, sales, business and partner development, sales support, and customer success positions around the world in order to achieve the $91 million in sales projection in 2023. Plaintiff documented every assumption for each team in a series of complex capacity models, which he shared and discussed with CEO Mathews, CFO Agarwal, President Shukla, and COO Kong, among others on the ELT.

44.     In early November 2022, when Plaintiff reported these findings to CFO Agarwal, CFO Agarwal blanched. Not only did he need about 85 new employees to meet the $91 million revenue projection for 2023, they needed to be hired and onboarded by the early second quarter of 2023 to have the required impact on the aggressive 2023 revenue projection.

45.     Upon information and belief, in 2021, CFO Agarwal either made up the $91 million revenue and -$8 million EBITDA goals from whole cloth, or wish-cast them without engaging in the requisite bottoms-up analytical rigor and due diligence necessary to (a) determine a plausible sales projection; or (b) ascertain what sales capacity, supporting resources, and marketing investments Defendants Near would need to reach the goal. While discussing the bottoms-up sales and revenue model with CFO Agarwal, CEO Mathews, COO Kong, and Controller Faieta, it became clear to Plaintiff that they either did not understand how a mature sales and marketing function operates, or how the accounting conversion from bookings to revenue works. They also lacked an understanding

of reasonable assumptions on the productivity of new and ramping sales personnel. Consequently, Plaintiff came to believe that any projections by CFO Agarwal, COO Kong, or Controller Faieta, including disclosures to the SEC, were unreliable.

46.    Plaintiff repeatedly and consistently pushed for Defendants Near to lower the $91 million revenue projection for 2023, to one that would require fewer new hires and less resources. Without discussing with the Plaintiff as CRO, the Near Decision-Makers ultimately reduced the revenue projection to about $81 million in mid-to-late November – still a very aggressive 35% annual growth target relative to 2022, and still requiring significant resources to deliver. The Near Decision-Makers refused to allocate the appropriate sales, marketing, customer success, and systems resources necessary to meet the modified sales projection.

47.    Upon information and belief, Defendants Near initially refused to lower the 2023 sales projection to something achievable because the Near Decision-Makers reported the 50%+ revenue increase projection to the SEC in the amended investor presentation filed with the SEC on May 20, 2022 ("Investor Presentation"). Upon information and belief, the Near Decision-Makers wanted to avoid any negative impression to potential investors that may derive from reporting a reasonable and supportable revenue number, since that would be much lower than the original, fanciful projections.

48.    At the same time, late in the second quarter of 2022, Defendants Near terminated about 20 U.S.-based marketing employees, including the white American Chief Marketing Officer Karen Steele ("CMO Steele"). Defendants Near also completely stopped spending on critical marketing investments, which are necessary for market awareness and to build sales pipeline opportunities. None of these details were disclosed as material changes in business condition in SEC filings and as required by SEC regulations.

49.    Moreover, upon information and belief, the Near Decision-Makers knowingly kept the 50%+ revenue increase because they expected Plaintiff to fail, and they planned to use him as a scapegoat once the company had gone public. Indeed, even though she had primary responsibility for

the dysfunctional and underperforming sales function for over three years prior to Defendants Near's hiring Plaintiff, COO Kong criticized Plaintiff, stating, "I don't think [Plaintiff] can deliver the numbers."

50.     When Plaintiff started working for Defendants Near, the ELT only had sporadic formal meetings. He pushed COO Kong to schedule them weekly, especially in light of the upcoming IPO. Nevertheless, the meetings were unlike any Plaintiff attended in other companies. Defendants Near did not create agendas for the meetings, so important issues were either not discussed, or were given short shrift. More puzzling, Plaintiff noticed that only he and GC Angelo were the only people who consistently took notes of the ELT meetings, and the only ones who regularly and proactively followed up with appropriate actions on the decisions reached at the ELT meetings. As a result, decisions reached in the ELT meetings were frequently forgotten, changed, or ignored, without regard to corporate strategy, governance, or accountability. GC Angelo, SVP Williams, and Plaintiff noted to each other on multiple occasions that CEO Mathews did not take notes, seemed to not pay attention in the meetings, and oftentimes forgot what was discussed and agreed upon, even the same day.

51.     It became clear to Plaintiff that it did not matter what was discussed in the meetings because Defendants Near did whatever CEO Mathews and CFO Agarwal declared at any given moment. With more experience and upon further analysis, Plaintiff determined that CFO Agarwal ultimately made the meaningful and consequential decisions for Defendants Near.

52.     From Plaintiff's past experience, he knew that the process of a company going public generates a great deal of close, detailed, collaborative work for all the corporate officers, and typically involves engaging an investment bank as underwriter, a team of seasoned reputable certified public accountants, a top reputable law firm with technology expertise, and other subject matter experts and advisors. The SEC rules are byzantine, and violating them comes with criminal liability for all company officers, including making all appropriate disclosures. Public companies have to comply with Generally Accepted Accounting Principles, which rules are also complex.

53.     Defendants Near planned to go public by merging with SPAC KludeIn: a company created for the sole purpose of merging with an existing private company so it can become a public company.

54.     At Defendants Near, however, the ELT was completely shut out of the meetings about the merger with KludeIn. The only officers of Defendants Near who participated in SPAC merger meetings were CEO Mathews, CFO Agarwal, and President Shukla, along with Sriram Raghavan, the Managing Director of KludeIn ("Managing Director Raghavan"). Defendants Near and KludeIn did not engage a traditional investment bank as underwriter. Their accounting team consists of CFO Agarwal and members of his staff, few of whom have corporate financial planning and analysis experience, including CFO Agarwal himself. In short, CFO Agarwal was doing the SPAC merger in-house, on the cheap, and without the typical and reputable external advisory panel and oversight.

55.     Defendants Near's SPAC merger with KludeIn had been delayed several times since it was first announced in May 2022. In November 2022, Defendants Near projected the transaction would occur in December 2022. Defendants Near did not consult with any Americans concerning the SPAC merger, and no Americans were involved in negotiating the SPAC merger.  Even though its public offering – and concomitant cash infusion – was imminent, Plaintiff learned via an offhand comment from GC Angelo in early October 2022 that Defendants Near was in the process of undertaking $100 million in debt from a lender of last resort named BlueTorch Capital. The introduction to BlueTorch was brokered by Managing Director Raghavan.

56.     This reason for raising this debt was not discussed in detail in any meetings of the ELT, only mentioned in passing by CEO Mathews. CEO Mathews refused to discuss in detail why Defendants Near was undertaking such a large amount of debt or what the funds would be used for. Plaintiff repeatedly attempted to understand these critical details, but CEO Mathews rebuffed him. No Asian members of the ELT asked questions about the need for, and nature of, the $100 million in debt. Upon information and belief, CEO Mathews and CFO Agarwal were the only members of the

ELT who negotiated the term sheet for the debt. Upon information and belief, GC Angelo's role was secondary, and he shared extensive updates on the ongoing negotiations with BlueTorch in conversations and via text messages. No one except the Near Decision-Makers, all Indian or Asian, were allowed to know the details of the debt raise, participate in those negotiations, and they would not be questioned, especially not by Americans.

57.    The Near Decision-Makers did not share clear internal financial, operational, or customer metrics with the ELT, nor did they share information about the company's balance sheet/debt position, cash flow, and cash burn rate. Accordingly, Plaintiff did not know if the financial information submitted to the SEC would withstand scrutiny and have the proper backup and support. Indeed, Defendants Near touted customer metrics in its SEC disclosures, such as net revenue retention, net promoter score, and customer satisfaction, but these metrics did not exist internally and were not used in the operation of Defendants Near..  Notwithstanding that, Plaintiff and others witnessed COO Kong saying, "Let's pray the SEC doesn't audit us. We will be out of business." Upon information and belief, Defendants Near pushed to go public before it was necessary to reveal financial information about the fourth quarter of 2022, because it was not favorable.

**Plaintiff Reports That Defendants Near Violates the GDPR, Does Not Have Data Privacy Certifications, Lies to Its Customers, and Submitted False Information to the SEC**

58.    Defendants Near represents that it is GDPR and CCPA compliant. Indeed, the Investor Presentation claims that Defendants Near offers "privacy compliant product solutions," and that "leadership in data privacy…creates a competitive advantage for Near." This claim of data privacy compliance is repeated in numerous SEC filings, on Defendants Near's website, its proposals and contracts, customer information documents, in social media and podcasts, and other publicly-facing materials.

59.    These claims are demonstrably untrue, and Plaintiff informed the ELT of issues concerning Defendants Near's data privacy and compliance repeatedly over his tenure. In particular,

Plaintiff raised concerns about the improperly sourced and acquired European consumer PII and mobile data, which Defendants Near moved out of the continent and sent to Near's data lake residing in its Amazon Web Services cloud infrastructure in Bangalore on a daily basis. In addition, due to inadequate security controls, the French system was vulnerable to hacking and data breaches. As a public company, Near would have to disclose any data breach or hacking incident should one occur.

60.    Specifically, Defendants Near provided one of its largest customers, Alieus Technologies, with a massive amount of data collected from over 140 countries, twice per day, every day, and had done so for 3+ years. Aelius Technologies paid Defendants Near $4.3 million annually, or about 7% of Defendants Near's annual revenue. Upon information and belief, the data includes PII and data that was not legally sourced and acquired, and lacks proper user/consumer consents. This data then makes its way via shell companies and intermediaries to the U.S. Department of Defense and related governmental agencies. Near sells PII and illegally procured global data to government entities through at least five shell companies.

61.    Upon information and belief, other customers and prospective customers of Defendants Near, as well as governmental and legal bodies, including the City of Amsterdam, Ikano Insight, North Carolina's Attorney General, and several members of the U.S. House of Representatives, have asked questions about Defendants Near's compliance with GDPR, CCPA, and other unethical data practices relating to PII, including such things as tracking of individuals to sensitive locations, such as abortion clinics or rehabilitation centers, or tracking individuals to their homes. Additional customers, prospective customers, and other interested parties had begun to ask similar questions in multiple countries, including the United States government. Defendants Near's response has been to deflect, misrepresent, and offer empty promises that compliance is being taken seriously.

62.    In truth, Defendants Near does not know the full extent of their exposure to data and privacy violations across all contracts worldwide because it  did not do the full analysis to determine

the scope of their exposure. Nevertheless, the scale is global and the impact of fines, penalties, and remediation work will threaten the company's ability to continue operating. Defendants Near do not have adequate human and financial resources to become compliant. The extent of Defendants Near's exposure, and the misrepresentations to the SEC and investing public, was a frequent subject of communications among Plaintiff, GC Angelo, SVP Williams, and others.

63.     When Plaintiff apprised the ELT of the failure to comply with GDPR and the massive revenue risk given Near's exposure on a range of contracts, CEO Mathews declared, "We should just not sell in Europe," rather than addressing the underlying, global data privacy problems. Notably, Defendants Near acquired France-based Teemo in November 2020, and this business has been a significant growth driver for the company. It could not and would not simply withdraw from the European market, especially given an existing customer relationship with the third largest grocery chain in France, Intermarché. Indeed, in separate meetings without Plaintiff present, COO Kong instructed sales teams to "keep selling in Europe and elsewhere and we'll figure something out." Upon information and belief, Near continues to sell and deliver non-compliant customer contracts, to this day.

64.     Upon information and belief, Defendants Near retains and misuses real-time bidding data from numerous global programmatic advertising networks across borders and without user consent. Instead of just placing one ad for a product on consumers' phones, Defendants Near gathers, packages, and tracks user data across the globe, illegally uses that data in its offerings for targeting purposes, and sells that information to business partners and customers. Near illegally retains this private and sensitive tracking data and the surrounding data logs for an indefinite period of time, even though regulations require vendors to delete, purge, and/or suppress this data after a modest time period.

65.     Upon information and belief, in response to requests for proposals and information security questionnaires from a major US home improvement retailer, a leading, global strategy

consulting firm, and many other customers and prospective clients, CTO Therani and other personnel in engineering and technical roles in Bangalore knowingly and willfully changed information, submitted doctored data privacy certifications, and signed attestations that Defendants Near is SOC2 and ISO 27001 compliant. When Plaintiff and SVP Williams raised this issue with COO Kong with respect to the home improvement retailer specifically, she simply responded that Defendants Near would not accept the business if awarded, rather than addressing the underlying and egregious governance and process breakdown and the data privacy compliance problems.

66.     Upon information and belief, Defendants Near regularly signs Master Service and Data Protection Agreements and Data Privacy Impact Assessments with its clients stating that Defendants Near is SOC2/ISO 27001 compliant, when it is not.

67.     At numerous ELT meetings, one-on-one conversations, and in writing, Plaintiff frequently apprised the ELT of the gap between what Defendants Near claims about PII sharing, sensitive location availability, GDPR, CCPA and SOC2/ISO27001 compliance and reality. Plaintiff warned that continuing to misrepresent the status of Defendants Near's data privacy policies and practices in SEC documents, its websites, social media, and in the public sphere, could have dire consequences for the business and the Near Decision-Makers. Defendants Near's response was to terminate Plaintiff's employment.

68.     Defendants Near's SEC filings state that it is a "Software as a Service" ("SaaS") business, but it is not. Defendants Near mainly provides a platform, data feeds/APIs, and "Data as a Service" ("DaaS"). Between 75-80% of Defendants Near's annual revenue comes from data feeds only, and the other 20-25% is preprocessed data accessible via Near's visualization platform. This is not "software" or "SaaS" in the commercially agreed-upon sense, or what investors and analysts would consider "SaaS". The illusion of "SaaS" to the investment community was solely intended to drive a higher company valuation and higher stock price once the company was publicly traded.

69.     Behind Plaintiff's back, CEO Mathews asked Plaintiff's team to review and modify Near's active contracts to construe Defendants Near as a SaaS business. Upon information and belief, Defendants Near started referring to itself as a SaaS provider because SaaS businesses valuation multiples are higher than platform and DaaS businesses. The higher valuation multiples are reflected in the appendix to the Investor Presentation, pages 43-45. On numerous occasions, Plaintiff, explained to CEO Mathews and CTO Therani how this mischaracterization would create an issue for Defendants Near in its SEC filings. Plaintiff was ignored.

70.     Defendants Near's S-4 filed on January 17, 2023, and prior investor presentations, contain misleading and untrue statements that imply or indicate that Defendants Near is a strong, mature, and transparent organization with high quality operational and financial controls and compliant data. For example,

- <u>Net Revenue Retention figures are unreliable and not properly audited</u>: Defendants Near has no modern or functional contract management system, The contract data itself is incomplete, resides in any number of locations (including one-off shared drives and the individual laptops of current and former employees), and have no standard terms. Indeed, many contracts lack material terms such as scope descriptions, fee schedules, start and end dates, and signatures. A company must have fully-accessible, "clean" and standardized contracts, with high-quality contract data, terms, fee schedules, and the proper analytical approach, to confidently and realistically measure things like Net Revenue Retention at global scale. Plaintiff was hired, in part, to create a contract management system and produce key metrics such as Net Revenue Retention. Without such a system and a complete dataset, Net Revenue Retention cannot be derived at a contract level and is, therefore, without evidentiary basis.

- Net Promoter Score (NPS) and Customer Satisfaction ratings are unreliable: industry standard "voice of customer" metrics like these are common to any technology company and are critical to measuring customer health, satisfaction, and willingness to continue doing business with a company. Defendants Near does not conduct customer satisfaction surveys and does not measure Net Promoter Score anywhere in the world on an ongoing and routine basis. Accordingly, Defendants Near cannot assert that its "voice of customer" metrics are derived from a representative sample of customers. Plaintiff repeatedly brought this to the attention of the Decision Markers. In fact, there are many customers and partners in the U.S. who are very unhappy and highly frustrated with Defendants Near's poor and deteriorating data quality, repeated commitments made by COO Kong that have not been kept, and overall unresponsiveness in delivering long-promised improvements.

- Revenue bridge and related revenue projections in investor presentations are unreliable: Upon information and belief, Defendants Near does not track, account for, or report customer bookings (sales) as defined by GAAP anywhere in the world, and certainly not in the United States. Plaintiff repeatedly requested bookings (sales) data by region and line of business for 2022 and prior years, as a basis for sales planning and to understand Defendants Near's conversion of bookings to revenue, as a basis for sales commission planning, and other basic management tasks. This data could never be provided. Revenue bridge and related bookings-to-revenue projections are not measured and not used by Defendants Near management. On numerous occasions, Plaintiff worked to educate the ELT on the differences between bookings and revenue, and the implications of

- 22 -
COMPLAINT

converting bookings to revenue for running the business. He was routinely ignored by Near Decision-Makers and "yes men."

- Because Defendants Near continues to misrepresent its privacy and data compliance, and sell non-compliant data in Europe, the U.S., and other international markets, all revenue from contracts selling the non-compliant data is at risk for disgorgement. This is not disclosed as a risk factor.

- Defendants Near claims that it "expects to continue this land and expand strategy as [it] scale the Customer Success Team. To that end, Near has recently hired a *Chief Revenue Officer* that will bring more structure to this strategy and harmonize it globally across our US and international teams." (Emphasis added.) Plaintiff is the Chief Revenue Officer to which Defendants Near refers, and his employment was terminated more than one month before the S-4 was filed. Moreover, the Near Decision-Makers limited his role to just the U.S., and stymied his work scaling up the customer success and sales support teams.

- Defendants Near fails to disclose material operational risks, such as its complete lack of information security posture, disaster recovery and business continuity plans. Further, every current and former engineer since May 2015 potentially has or had access to static API keys that grant 100% read and write access to the entirety of Defendants Near's Amazon Web Services data buckets, including PII. These keys are still in use. Near is incredibly vulnerable to a hack or data breach, and lock-out by bad actors – if customers were to find out their PII data was compromised or exfiltrated, it would have a disastrous impact on the business.

- Defendants Near lacks a mature back-office operation, with necessary audit controls, to adequately support critical day-to-day functions. Customer invoices

COMPLAINT

in the U.S. are prepared manually, and are prone to error. The key individual responsible for this process recently left the company, with no backup plan in place. Upon information and belief, hundreds of thousands of dollars in annual travel and business expenses incurred by CEO Mathews are processed and reimbursed without the proper documentation and receipts, as required by the IRS and other governmental entities. Upon information and belief, Defendants Near pays for CEO Mathews' Beverly Hills residence ($192,000 annually), but does not treat it as a taxable benefit to CEO Mathews. These gaps in compliance expose Defendants Near to audit and further regulatory scrutiny. These are not disclosed as risk factors.

**Anti-White, Anti-American Animus Pervades Near Operations**

71. While interviewing for the CRO position, Defendants Near told Plaintiff that he would have up to 18 months to build a scalable, global revenue function in preparation for, and the run-up to, Defendants Near's IPO. In his first months as CRO, CEO Mathews and COO Kong repeatedly told Plaintiff that he had complete control to make all personnel decisions for marketing, sales, and customer success, with human resources as his advisor and business partner. This is the normal arrangement for someone of his rank in the organization. He was careful to be fully transparent and shared with all stakeholders, including CEO Mathews, COO Kong, Controller Faieta, and HR leader Lindsay Feller, the role definitions, compensation ranges, and recruiting needs for the revenue function.

72. Even though Plaintiff was transparent in his efforts and based compensation ranges upon verifiable data and industry benchmarks, including complete alignment with what Defendants Near paid existing/current employees in sales roles, CEO Mathews, CFO Agarwal, and COO Kong could not understand his hiring strategy and the need to attract top talent.

73.     The Near Decision-Makers believed Plaintiff was "hiring a bunch of expensive Americans," and told him so quite often. Specifically, whenever CEO Mathews would criticize and question Plaintiff for "hiring a bunch of expensive Americans," Plaintiff would show with data that he paid the new account executives the same amount that Defendants Near paid the former, unproductive account executives. The facts and data, however, never dispelled the Near Decision-Makers' belief that hiring Americans was a waste of resources.

74.     This belief is further supported by Defendants Near's waves of layoffs of key U.S.-based engineering, sales, business development, customer success, and operations resources, who are predominantly white Americans. CEO Mathews selected them for layoff because they "make too much money," rather than any analysis of business need. The layoffs put the future of Defendants Near's entire U.S. operation at serious risk. Defendants Near has not disclosed these material events to the SEC or investors.

75.     Plaintiff was concerned that the Near Decision-Makers were prejudiced against Americans, and white Americans in particular. His concerns were confirmed by several former executives and advisors for Defendants Near. They informed Plaintiff about the Near Decision-Makers' animus towards white Americans and warned him that they would turn on him in the blink of an eye. One individual said, "It's not fun being lied to, is it?"

**CPO Joseph Seeks to Hire White, American, Heterosexual Window-Dressing**

76.     Underscoring the extent to which Near Decision-Makers viewed their white, American colleagues as window-dressing, CPO Joseph provided a recruiter with the specifications for a new U.S. HR director. Instead of relaying key competencies and experiences for the role, CPO Joseph stated his requirements: he wanted a "white, American, heterosexual male in his 40s." Plaintiff had a phone call with the recruiter immediately after the call with CPO Joseph, wherein the recruiter expressed his incredulity and distress that a CPO would so blatantly disregard US anti-discrimination laws and would share these views so openly.

**<u>Near Undermines Complainant's Role Because of His Race and National Origin</u>**

77.     In early November 2022, immediately after Plaintiff reported to CFO Agarwal the impossibility of meeting the $91 million revenue projections for 2023, without hiring about 85 new employees worldwide, Plaintiff noticed a marked change in how the Near Decision-Makers and "yes-men" treated him. Simply, they started to disregard him and freeze him out altogether. His one-on-one meetings with Near Decision-Makers were cancelled or rescheduled, calls and emails went unanswered for weeks, his requests denied or ignored, and Defendants Near withheld his commission for the third and fourth quarter of 2022, along with the signing bonus that was part of the compensation he negotiated to join Defendants Near. Defendants Near also refused to finalize his employment agreement, the negotiation of which played a role in his termination.

78.     In mid- to late November 2022, he learned by happenstance that the Near Decision-Makers had removed the international business from his reporting line and reassigned it to Bangalore-based Sales Leader Kuppili. He also learned that COO Kong and CFO Agarwal were having 2023 planning discussions with his sales teams, behind his back. His manager, CEO Mathews, did not bother telling him. Plaintiff learned about this functional demotion because GC Angelo happened to hear it from a Near Decision-Maker or "yes-man." Moreover, a particular sales leader based outside the U.S. brought it to Plaintiff's attention as they were confused about the chain of command.

79.     Upon information and belief, the international component of Plaintiff's job was reassigned because Sales Leader Kuppili thought it was unfair that he had to report to an American. CEO Mathews reportedly responded, "You don't have to report to an American." Thus, Plaintiff was CRO for the global company, but only controlled the US-based sales staff. The exact same situation befell SVP Williams, when his international, Indian team was taken away from him because he was an American.

80.     Before Plaintiff learned the truth, he spent much of October and November working closely with the sales leader in France, Lola Millet-Bourgogne, to develop a strategy for her team to

COMPLAINT

meet the roughly 50% revenue increase CFO Agarwal projected for her group in 2023, again without the proper bottoms-up analysis. Plaintiff sought and received commitments from COO Kong for the resources Ms. Millet-Bourgogne would need to achieve this increase. Unbeknownst to Plaintiff, however, CFO Agarwal and COO Kong had ongoing backchannel communications directly with Ms. Millet-Bourgogne, countermanding the commitments they made to Plaintiff.

81.    Upon information and belief, the Near Decision-Makers undermined and marginalized Plaintiff to (a) minimize the extent to which he would learn about Defendants Near's untruthful representations to the SEC, including failures to disclose material business relationships, changes in business conditions, and noncompliance with corporate governance rules and privacy laws; and (b) to motivate him to quit or "fall in line" so they could more effectively scapegoat him for Defendants Near's failure to achieve the ill-advised projected increase in revenue in 2023.

82.    The Near Decision-Maker's dislike of white Americans motivated their toxic, unfair treatment of Plaintiff. The Near Decision-Makers created and promoted a hostile work environment for Plaintiff because of his race and national origin.

**Near Undermines Other White American Business
Leaders Because of Their Race and National Origin**

83.    Plaintiff was not the only white American employee whom the Near Decision-Makers subjected to a hostile work environment. Other targets include dissenter SVP Williams, Ed Devinney (VP Product & Compliance), Kerry Pearce (Senior Vice President Product & Strategy), Lindsay Feller (U.S. Human Resources Leader), and Karen Steele (Chief Marketing Officer) (collectively, the "Targets").

84.    Each of the Targets suffered from the Near Decision-Makers animus towards white Americans.

85.    For example,

- Dissenter SVP Williams lost faith with Defendants Near after the Near Decision-Makers authorized a reduction-in-force over his staff, leaving him with a skeleton crew in the U.S. to manage a highly complex operation that comprised two-thirds of Defendants Near's annual revenue and some of its largest customer contracts. The Near Decision-Makers selected 15 U.S.-based employees for layoff, including members of SVP Williams staff, operations, product, and data science employees and others who were "making too much money" (according to CEO Mathews) on January 6, 2023. Dissenter SVP Williams's authority over the engineers located in Bangalore, India had already been secretly removed from his reporting line earlier in 2022. Upon information and belief, the engineers were reassigned to VP Palappetty after VP Palappetty took umbrage with reporting to a white American, and complained to CEO Mathews and COO Kong. SVP Williams also learned about this functional demotion by happenstance. SVP Williams repeatedly informed the ELT about privacy and compliance gaps in Defendants Near's offerings. Upon information and belief, the Near Decision-Makers undermined and functionally demoted SVP Williams because he was window-dressing and because he questioned the way Defendants Near operated. In addition, SVP Williams was promised adequate, market rate compensation by COO Kong, given his senior title and long experience, once the company went public. SVP Williams had been paid less than 50% of market rate upon joining the company in good faith, and was asked repeatedly by COO Kong to be patient while she promised to adjust his pay in the future. SVP Williams' pay was never adjusted. After many unhappy months in a severely diminished leadership role, severely underpaid, and having been marginalized by the Near Decision-Makers and COO Kong, SVP Williams left Near on April 30, 2023.

COMPLAINT

- CMO Steele had significant experience at major technology companies and she built-out a high functioning US-based marketing team. She also questioned Defendants Near's business practices and lack of governance. Her employment was summarily terminated shortly before Plaintiff's employment began. Upon information and belief, the Near Decision-Makers and "yes-men" saw fit to spread a rumor that Ms. Steele was incompetent and had a drinking problem which informed their decision. Upon information and belief, Ms. Steele's employment was terminated because she was window-dressing and she started raising issues with the way Defendants Near operated.

- Kerry Pearce was a long-tenured product and strategy executive at UberMedia, which Defendants Near purchased in 2021. She questioned some of Defendants Near's business practices and approach to compliance issues, particularly after the KludeIn merger was announced. Even though Plaintiff wanted to retain Ms. Pearce for his team, COO Kong fired her in October 2022, telling Plaintiff that she was "too toxic," without further explanation.

- Ed Devinney became the Vice President of Platform Privacy for Defendants Near in August 2022. He quickly came to see the pervasive privacy and compliance issues facing Defendants Near, and led the work on privacy strategy. He and Plaintiff recommended that Defendants Near stop selling non-compliant deals, communicate the existing data issues with customers, and restrict data access outside the European Union (which required data repatriation from India). Near Decision-Makers refused to make this a priority. Accordingly, on January 6, 2023, when Defendants Near laid off Mr. Devinney's colleagues working on data and privacy compliance, Mr. Devinney resigned out of disgust on the spot.

86.    The Near Decision-Maker's dislike of white Americans motivated their toxic unfair treatment of the Targets. The Near Decision-Makers created and promoted a hostile work environment for the Targets because of their race and national origin.

87.    Upon information and belief, Defendants Near continues to propagate a false narrative about Plaintiff, based on the pretextual and fabricated reasons for his dismissal, given his ethnicity and because he opposed the Near Decision-Makers' violations of SEC laws and regulations. Upon information and belief, the Near Decision-Makers and "yes men" continue to engage in defamation against Plaintiff. This follows a similar pattern to other Targets.

**<u>Documents Show That Defendants Near's "Cause" For Termination is Pretextual</u>**

88.    By letter dated December 22, 2022, counsel for Defendants Near explained the purported reasons why Defendants Near terminated Plaintiff's employment. These are: "repeated incidents of insubordination after contrary directives from [Defendants Near], and dishonest conduct." Defendants Near claims these actions, and the decision to terminate his employment, occurred before Plaintiff's December 5, 2022 email setting forth unlawful behavior and specific instances of providing false information to the SEC and, therefore, Plaintiff is not entitled to whistleblower protection. These explanations are pretextual; contemporaneously-written business records and numerous text messages and emails between and among Near Decision-Makers, yes-men, and Plaintiff tell a very different story.

89.    Defendants Near claims it terminated Plaintiff's employment because it ordered a hiring freeze on November 15, 2022, yet Plaintiff sent offer letters to four "new" employees during the week of November 21, 2022. Defendants Near omits key information.

90.    First, it was not a mandated hiring freeze; rather, CEO Mathews asked for a pause in new hiring while the ELT worked on the modified 2023 revenue plan. Plaintiff agreed not to hire additional new headcount during an in-person meeting in Pasadena on November 15, 2022, attended by Near Decision-Makers, COO Kong, and others, but noted he had four candidates that already

received and accepted oral offers of employment. Moreover, two of the four candidates were backfilling roles for which the incumbents had recently left Defendants Near's employ. Plaintiff confirmed with COO Kong, Defendants Near's Controller, and GC Angelo the status of the four candidates hired before November 15, 2022 in writing.

91.    Second, CEO Mathews agreed that Plaintiff could proceed with sending offer letters to the four new candidates, but requested that Plaintiff wait until the Thanksgiving Day holiday to send them, as further 2023 planning work was a work-in-progress. Plaintiff complied with this request. Plaintiff also confirmed this arrangement at least twice with CEO Mathews: in several phone calls and in writing.

92.    Third, Plaintiff continued to keep the Near Decision-Makers apprised of his hiring efforts, and any one of them could have protested his actions between the date of the purported hiring freeze and the day Defendants Near terminated his employment. Indeed, he gave CEO Mathews a hiring update via Slack on November 28, 2022, along with a list of his must-have resources for the fourth quarter of 2022 and the first quarter of 2023, at CEO Mathews' request. CEO Mathews committed to hiring the four candidates and said nothing about a "hiring freeze."

93.    On November 28, 2022, CFO Agarwal discussed the supposed "hiring freeze" and supposed "new hiring policy" with Plaintiff. This was weeks after the four offers were extended and accepted, two weeks after the meeting in Pasadena where Plaintiff reminded the ELT about the four candidates, and a week after the offer letters were issued, signed, and returned. This was how the Near Decision-Makers operated: make a policy without consulting the relevant white, American stakeholders, fail to properly apprise the relevant stakeholders of the policy, and then accuse the relevant stakeholders of breaking the policy.

94.    Defendants Near also claims that Plaintiff engaged in dishonest conduct when he altered the terms of his offer letter after-the-fact. This is also pretextual.

95.     Plaintiff negotiated his original offer letter employment agreement with COO Kong. Plaintiff wanted a specific term changed for change of control vesting, as well as several relevant performance incentives and business travel stipulations added, along with customary protection for early/abrupt termination, and COO Kong agreed in writing and orally in several conversations. At the time, Defendants Near's GC Angelo had just joined the company and was still getting up-to-speed. Accordingly, COO Kong asked Plaintiff if he would accept the employment agreement with the understanding that the specific term and his desired additions would be amended to Plaintiff's liking when the new general counsel started working for Defendants Near the next month. Plaintiff agreed in good faith and believed that COO Kong acted in good faith. Little did he know COO Kong had no intention of honoring any of these requests or agreements.

96.     In the time since GC Angelo joined Defendants Near, Plaintiff had multiple oral conversations, and sent multiple email, text, and Slack messages concerning the modifications of the term of his employment agreement, requesting the correct language, to which COO Kong had agreed. He also sent a clearly revised employment agreement containing the language he preferred with his changes readily apparent. This was all done transparently, in writing, and using the "track changes" feature in Microsoft Word so COO Kong and GC Angelo could see exactly what Plaintiff proposed to change. Indeed, COO Kong acknowledged with Plaintiff that she had seen and was aware of the modifications consistent with the agreement pursuant to which Plaintiff accepted employment with Defendants Near. Moreover, GC Angelo confirmed with Plaintiff that COO Kong had seen and acknowledged these modifications.

97.     Plaintiff did not engage in subterfuge concerning his employment agreement. Rather, he was scrupulously transparent. The written record reveals repeated requests for updates on progress over many weeks, along with significant dialogue on the employee agreement between GC Angelo, COO Kong, and Plaintiff.

98.     Finally, it makes no difference if Defendants Near decided to terminate Plaintiff before Plaintiff sent his December 5, 2022 email to the ELT, concerning Defendants Near's business practices, privacy violations, and SEC violations. As soon as Plaintiff noticed anything amiss in how Defendants Near operated, he reported it contemporaneously to the ELT, "yes men," Targets, including CEO Mathews, COO Kong, Controller Faieta, SVP Williams, and GC Angelo.

## CAUSES OF ACTION

## AS AND FOR A FIRST CAUSE OF ACTION

## Race and National Origin Discrimination in Violation of Title VII of the Civil Rights Act

99.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

100.     Defendants Near have discriminated against Plaintiff in violation of Title VII by subjecting him to different treatment on the basis of his race and national origin. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendant's wrongful conduct.

101.     Defendants Near have discriminated against Plaintiff by treating him differently from and less preferably than similarly situated Indian and/or Asian employees and by subjecting him to disparate terms and conditions of employment, and other forms of discrimination on the basis of his race and national origin in violation of Title VII.

102.     Defendants Near's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

103.     As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income including, but not limited to wages, social security, and other benefits due him.

104.    Additionally, Plaintiff has suffered the indignity of discrimination, the invasion of his rights to be free from discrimination, and great humiliation, which has manifested in serious emotional stress and physical illness.

105.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about his future and his ability to support himself and his family, harm to his employability and earning capacity, painful embarrassment among his family, friends, and co-workers, damage to his good reputation, disruption of his personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

106.    By reason of Defendants Near's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII.

107.    As a result of Defendants' violation of Title VII, Plaintiff claims compensatory and punitive damages, and attorneys' fees.

### AS AND FOR A SECOND CAUSE OF ACTION

**Race and National Origin Discrimination in Violation
of the California Fair Employment and Housing Act**

108.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

109.    Defendants Near have discriminated against Plaintiff in violation of the California Fair Employment and Housing Act, California Government Code § 12900 *et seq*. ("FEHA") by subjecting him to different treatment on the basis of his race and national origin. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendant's wrongful conduct.

110.    Defendants Near have discriminated against Plaintiff by treating him differently from and less preferably than similarly situated Indian and/or Asian employees and by subjecting him to disparate terms and conditions of employment, and other forms of discrimination on the basis of his race and national origin in violation of FEHA.

111.    Defendants Near's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

112.    As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income including, but not limited to wages, social security, and other benefits due him.

113.    Additionally, Plaintiff has suffered the indignity of discrimination, the invasion of his rights to be free from discrimination, and great humiliation, which has manifested in serious emotional stress and physical illness.

114.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about his future and his ability to support himself and his family, harm to his employability and earning capacity, painful embarrassment among his family, friends, and co-workers, damage to his good reputation, disruption of his personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

115.    By reason of Defendants Near's discrimination, Plaintiff is entitled to all remedies available for violations of FEHA.

116.    As a result of Defendants' violation of FEHA, Plaintiff claims compensatory and punitive damages, and attorneys' fees.

## **AS AND FOR A THIRD CAUSE OF ACTION**

### **Retaliation in Violation of Title VII of the Civil Rights Act**

117.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

118.    In August 2022, Plaintiff and Defendants Near entered into a contract (the "Contract") pursuant to which Plaintiff would work for Defendants Near and, in exchange, Defendants Near would pay Plaintiff an annual base salary plus quarterly commissions on the certain sales generated

by Defendants Near. They also agreed to pay Plaintiff a signing bonus of $100,000 to leave his then-current position, $50,000 of which was due on January 1, 2023. Finally, Plaintiff and Defendants Near agreed that if terminated Plaintiff the Contract without cause (i.e., terminated Plaintiff's employment) before his second anniversary with the company, Defendants Near would pay Plaintiff his annual base salary, and full bonus and commission, totaling $600,000.

119.    Plaintiff fully performed under the Contract. From August 1, 2022 until his employment was terminated on December 7, 2022, Plaintiff committed his full time to working for Defendants Near.

120.    Defendants Near only partially performed under the Contract. It paid Plaintiff his annual base salary, but refuses to pay Plaintiff the commissions he earned for the fourth quarter of 2022.

121.    Further, Defendant Near refuses to pay Plaintiff the agreed upon early termination payment of $600,000.

122.    Defendants Near breached the Contract.

123.    As a result of Defendants Near's breach of the Contract, Plaintiff has suffered damages.

### AS AND FOR A FOURTH CAUSE OF ACTION

#### Promissory Estoppel

124.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

125.    Defendants Near promised Plaintiff that if he came to work for them, they would pay him an annual base salary plus quarterly commissions on the certain sales generated by Defendants Near, and a guaranteed signing bonus of $100,000 to leave his then-current position, $50,000 of which was due on January 1, 2023. Finally, Defendants Near promised to pay Plaintiff $600,000 if

Defendants Near terminated Plaintiff's employment without cause before his second anniversary with the company.

126. Plaintiff relied upon Defendants Near's promises and left his then-current employment to begin working for Defendants Near.

127. Plaintiff's reliance was reasonable and a foreseeable consequence of Defendants Near's promises.

128. As a result of his reliance, Plaintiff has been injured. Defendants Near terminated Plaintiff's employment on December 7, 2022, yet Defendants Near refuses to pay Plaintiff $75,000 in commissions for the fourth quarter of 2022, or the termination payment of $600,000. Defendants Near have also denied Plaintiff the $50,000 payment towards his $100,000 signing bonus by terminating his employment three weeks before the payment was due.

129. Plaintiff has been injured in an amount that equity requires, and consistent with Defendants' Near's promises.

## AS AND FOR A FIFTH CAUSE OF ACTION

### Quantum Meruit

130. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

131. Defendants Near explicitly requested that Plaintiff work for it as Chief Revenue Officer beginning August 1, 2022, in exchange for him an annual base salary plus quarterly commissions on the certain sales generated by Defendants Near, and a signing bonus of $100,000, $50,000 of which was due on January 1, 2023. Finally, Defendants Near promised to pay Plaintiff $600,000 if Defendants Near terminated Plaintiff's employment without cause before his second anniversary with the company

132. Plaintiff worked for Defendants Near as its Chief Revenue Officer from August 1, 2022 to December 7, 2022.

133.    Plaintiff conferred a considerable benefit upon Defendants Near, but Defendants Near have not paid Plaintiff the fair market value for his services. Specifically, Defendants Near have not paid Plaintiff the $75,000 in commissions he earned for the fourth quarter of 2022 or the early termination fee of $600,000. Further, Defendants Near withheld the $50,000 signing bonus payment because it terminated Plaintiff's employment three weeks before the payment was due.

134.    Plaintiff has been injured in an amount that equity requires, and consistent with what Defendants Near refused to pay Plaintiff.

### AS AND FOR A SIXTH CAUSE OF ACTION

### Fair Labor Standards Act

135.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

136.    By failing and refusing to pay Plaintiff his commission, bonus, and early termination wages on a timely basis, Defendants Near violated and continues to violate the Fair Labor Standards Act.

137.    As a result, Plaintiff suffered damages and seeks compensatory damages, statutory liquidated damages, and attorneys' fees and costs.

### AS AND FOR A SEVENTH CAUSE OF ACTION

### California Labor Code Section 204 *et seq.*

138.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

139.    By failing and refusing to pay Plaintiff his commission, bonus, and early termination wages on a timely basis, Defendants Near violated and continues to violate California Labor Code § 204 *et seq.*

140.    As a result, Plaintiff suffered damages and seeks compensatory damages, statutory liquidated damages, and attorneys' fees and costs.

## AS AND FOR A EIGHTH CAUSE OF ACTION

### Illinois Wage Payment and Collection Act, 820 ILCS 115/1

141.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

142.    By failing and refusing to pay Plaintiff his commission, bonus, and early termination wages on a timely basis, Defendants Near violated and continues to violate the Illinois Wage Payment and Collection Act.

143.    As a result, Plaintiff suffered damages and seeks compensatory damages, statutory liquidated damages, and attorneys' fees and costs.

## AS AND FOR A NINTH CAUSE OF ACTION

### California Whistleblower Protection Act, Cal. Lab. Code § 1102.5

144.    Plaintiff realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

145.    Plaintiff had reasonable cause to believe that Defendants Near violated various laws, including federal securities laws and regulations, and Title VII of the Civil Rights Act of 1964.

146.    Plaintiff disclosed his reasonable belief to people with authority over him and another employee who had the authority to investigate, discover, or correct violations or noncompliance, including CEO Mathews and GC Angelo.

147.    Defendants Near retaliated against Plaintiff for disclosing his reasonable belief by terminating his employment and refusing to pay commissions he had earned.

148.    As a result, Plaintiff suffered damages and seeks compensatory damages and other damages, and attorneys' fees and costs.

## JURY DEMAND

149.    Plaintiff demands a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

i.    On Plaintiff's First Cause of Action, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial.

ii.   On Plaintiff's Second Cause of Action, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial.

iii.  On Plaintiff's Third Cause of Action, awarding Plaintiff compensatory and other damages, in an amount to be determined at trial.

iv.   On Plaintiff's Fourth Cause of Action, awarding Plaintiff damages in an amount that equity requires.

v.    On Plaintiff's Fifth Cause of Action, awarding Plaintiff damages in an amount that equity requires.

vi.   On Plaintiff's Sixth Cause of Action, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial.

vii.  On Plaintiff's Seventh Cause of Action, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial.

viii. On Plaintiff's Eighth Cause of Action, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial.

ix.   On Plaintiff's Ninth Cause of Action, awarding Plaintiff damages in an amount to be determined at trial.

x.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

Dated: New York, New York
       October 4, 2023

Respectfully submitted,

GODDARD LAW PLLC
*Attorneys for Plaintiff*

By:_____/s/ Siobhan Klassen_____
Siobhan Klassen
39 Broadway, Suite 1540
New York, NY 10006
(646) 964-1178
siobhan@goddardlawnyc.com